## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF INDIANA
### NEW ALBANY DIVISION

| | | |
|---|---|---|
| UGBE OJILE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:23-cv-00142-TWP-KMB |
| | ) | |
| WARDEN Correctional Reception Center, | ) | |
| | ) | |
| Respondent. | ) | |

## ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS

This matter is before the Court on Petitioner Ugbe Ojile's ("Ojile") Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2254, (Dkt. 1), and two Motions for case status (Dkts. 18, 19). An Indiana jury convicted Ojile and his codefendant, Kenyatta Erkins ("Erkins"), of conspiracy to commit robbery resulting in serious bodily injury, and Ojile was sentenced to 50 years imprisonment. (Dkt. 11-6 at 130–31, 156.) Ojile alleges (1) insufficient evidence supports the conviction in violation of due process under the Fifth Amendment, (2) juror misconduct denied him the right to an impartial jury in violation of the Sixth Amendment, and (3) trial and appellate counsel provided ineffective assistance in violation of the Sixth Amendment. (Dkt. 1). The Respondent contends Ojile's claims are procedurally defaulted, meritless, or both. (Dkt. 10). For the reasons explained below, Ojile's petition for a writ of habeas corpus is **denied**, a certificate of appealability is **denied**, and the motions for case status, are **granted**.

## I.     BACKGROUND

### A.     Facts Underlying the Offense

The Indiana Court of Appeals summarized the facts underlying Ojile's conviction:

On the evening of October 5, 2010, Ojile and Erkins were being monitored by police as they drove to and from various casinos. The police had obtained a

1

wiretap warrant for Erkins's cell phone and a warrant to attach GPS monitors to Erkins's vehicle and Ojile's girlfriend's vehicle. That night, Ojile drove his girlfriend's Volkswagen Jetta from Erkins's residence to the Hollywood Casino in Lawrenceburg, to the Grand Victoria Casino (now Rising Sun), and then to Belterra Casino in Florence. Finally, they drove back to the Grand Victoria Casino, arriving at 12:50 a.m. Ojile went inside the casino, and Erkins stayed in the car. Ojile remained in the casino for about two and a half hours. Ojile's actions in the casino were recorded by the casino's surveillance cameras. Except for the times Ojile stepped away to make a phone call, he stood near a card table watching S.M. play cards.

During the early morning hours of October 6, 2010, Ojile and Erkins spoke on their cell phones multiple times. Around 1:00 a.m., Ojile called Erkins and told him that S.M. was playing cards and had about $600 in front of him on the table, but Ojile was going to leave. Ten minutes later, Ojile called Erkins and told him that as he was about to leave, he saw S.M. take what appeared to be at least $20,000 out of his pocket to purchase more chips. Ojile told Erkins that he did not want to waste an entire evening, but that it would be worth it to wait and see if S.M. was going to leave soon. He asked Erkins for his opinion. Erkins replied that he was in the car and would do whatever Ojile wanted. Ojile asked Erkins if he wanted to wait fifteen or twenty minutes. Erkins said that they could wait another hour.

At 2:48 a.m., Erkins called Ojile to ask what was going on. Ojile told him that he had heard S.M. turn down an offer from the casino for a room, so he knew that S.M. was not going to spend the night at the casino. Ojile told Erkins that "we should go lay on him" because S.M. just won $28,000 on the roulette machine. Tr. at 321; State's Ex. 3, 7. Ojile said, "I willing like, go all the way with this mother f***er. . . . I don't think we are going to see any like this like anytime soon." *Id.;* State's Ex. 3, 7. Ojile told Erkins that S.M. was drunk. Ojile said that he was going to get some chips and something to eat, and Erkins said that was all right.

At 3:37 a.m., Ojile walked out of the casino. At 3:41 a.m., S.M. reserved a hotel room at the casino. At 3:49 a.m., Ojile and Erkins left Grand Victoria Casino and drove to the Hollywood Casino. They stayed there thirty minutes and then drove to Erkins's residence. Ojile dropped Erkins off and drove home. While Ojile was driving home, they had another cell phone conversation (the "Last Conversation"), in which they discussed robbing S.M. the following day and agreed that S.M. would not easily surrender his money:

Ojile: Yeah, so I take it's a wrap like that's a hot area right?

Erkins: I mean, it might not be a wrap but I'm just saying though like, like just being around there in the day time and s**t like that going off knowing that that's a working neighborhood.

Ojile: Right.

2

Erkins: You know what I'm saying? Like it probably still can work [robbing S.M.] but, I just think he gonna be a problem.

Ojile: Yeah, he ain't gonna just be no smooth.

Erkins: Yeah I don't think he a be smooth.

Ojile: Especially cuz it's day, he might just . . .

Erkins: Yeah that's what I'm saying like, being day time and you know whatever, whatever, you know really ain't got nobody to help, if we kind of like roughed him up and s**t like that like. I don't know, like I said man, them mother f***ing arabs, be thinking like they like they, they be thinking they niggas and s**t.

Ojile: Right.

Erkins: They not niggas, cause even a nigga could try to do mother f***ers be on some bulls**t. Smack them around a little bit.

Ojile: F**k.

Erkins: I told you man, seems like everything I told you, like when you see something, told you, mother f***ers be staying (laughing).

Ojile: Right.

Erkins: That's exactly what be happening, mother f***ers be stayin, you like all hell no. Yep, you can't put too much energy in this s**t.

. . . .

Ojile: Try again tomorrow or something with this s**t.

Erkins: That's it. Yeah, but you know. Like I said, you can't be putting too much into it, you know these week, these weekdays, you know what I mean? Either, either it is or it ain't. You know what I mean. It's like s**t, if it ain't like just keep it moving, you know cuz I mean like you know s**t mother f***ers, think mother f***ers should put their overtime in on a mother f**ing weekends man. Them weekdays, man, them days should kind of end earlier, like if you don't see, if you don't see nothing early it's probably just time to just keep it moving.

. . . .

Ojile: But today was kind of true to the situation man, because like dude that got a lot of s**t man, its pocket gonna look fat, and today

3

was just a test[a]ment to it, you know, it ain't like, I seen it fat, I was like man that ain't no napkin, you know (laughing).

Erkins: Right, it wanted no (inaudible) sheet.

Ojile: Right, so dude had to go hard when nigga had that bulge, you know what it is (laugh).

. . . .

Erkins: So, you at, you at the crib?

Ojile: No, I'm not. I'm a still on Colerain trying to get to 74, but I'm straight man, so yeah, you wanna stay at home with that nigga, and then uh, we will try tomorrow.

Erkins: Alright.

State's Ex. 2, 7.

In the early morning hours of October 7, 2010, Erkins and Ojile drove away from the Hollywood Casino in Erkins's Dodge Magnum. At approximately 2:30 a.m., Ohio police stopped and searched Erkins's Dodge. Police seized a backpack from the floor in front of the passenger seat in which Ojile had been sitting. The backpack contained several documents with Ojile's name on them, a .40 caliber Glock handgun, a BB gun that looked like a handgun, and a .40 caliber cartridge. Police also found dark clothing, camouflage gloves, and a roll of duct tape. Ojile was still wearing the same clothes he had on the night before. Police also searched Ojile's apartment and discovered a loaded magazine for the Glock.

State's Ex. 6 at 3-7.

On March 10, 2011, Appellants were each charged with one count of class A felony conspiracy to commit robbery resulting in serious bodily injury . . . On March 12, 2012, a joint jury trial commenced with the selection of jurors. On the second day of trial . . . the State moved to . . . amend the conspiracy charges by substituting Ojile's name for Erkins's as the person who committed the overt act of surveilling the victim. The motion was granted over Appellants' objections. The jury found Appellants guilty as charged. They appeal.

*Erkins v. State*, 988 N.E.2d 299, 303–05 (Ind. Ct. App. 2013).

S.M. was never robbed. Ojile argues the trial evidence shows that any conspiracy ended the night before, and he and Erkins abandoned their plans and were not going to follow through and "go all the way." (Dkt. 9 at 9). Trial counsel's strategy during the trial

4

was to argue that no crime had taken place and while there were discussions, neither Ojile

nor Erkins had taken a step to commit the crime. (Dkt. 11-1 at 77).

### B.    Procedural Summary

The Court of Appeals affirmed the judgment. *Id.* The Indiana Supreme Court denied Ojile's

petition for transfer. *Erkins v. State*, 13 N.E.3d 400, 405 n.5 (Ind. 2014). The Supreme Court of

the United States denied certiorari. *Ojile v. Indiana*, 574 U.S. 1087 (2015).

In May 2017, Ojile filed an initial *pro se* petition. (Dkt. 10-12 at 2. A post-conviction

evidentiary hearing was held, and the petition denied. (Dkts. 11-1; 11-5 at 160–73. Ojile appealed

and the Indiana Court of Appeals affirmed. *Ojile v. State*, 207 N.E.3d 1221 (Ind. Ct. App. 2023).

The Indiana Supreme Court denied transfer. *Ojile v. State*, 209 N.E.3d 1183 (Ind. 2023).

Ojile filed a motion for leave to file a successive state petition for post-conviction relief.

(Dkt. 16-1 at 5–23). The Indiana Court of Appeals declined to authorize the petition finding Ojile

failed to establish a reasonable possibility he is entitled to post-conviction relief. (Dkt. 16-1 at 4.

On August 14, 2023, Ojile filed the instant petition for a writ of habeas corpus under 28

U.S.C. § 2254. (Dkt. 1). The Respondent filed a return to the order to show cause and Ojile filed

a reply. (Dkts. 10; 16).

## II.    <u>GOVERNING STANDARDS</u>

A federal court may grant habeas relief only if the petitioner demonstrates he is in custody

"in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a). 28 U.S.C.

§ 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the

Antiterrorism and Effective Death Penalty Act (AEDPA):

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). A federal habeas court presumes a state court's factual determinations are correct unless the petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### III.    Discussion

### A.    Ground 1—Sufficiency of the Evidence

Ojile alleges the State violated due process by failing to present sufficient evidence for his conviction for conspiracy to commit robbery resulting in serious bodily injury. (Dkt. 1 at 6, 15). Specifically, he argues the insufficient evidence to support a conviction for class A felony

conspiracy to commit robbery resulting in serious bodily injury because the alleged victim S.M. was "never even touched. *Id.*

### 1.    Standards for Evaluating Sufficiency of the Evidence

Evidence is constitutionally sufficient to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). This "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16. A reviewing court, when "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

Where circumstantial evidence is used to establish guilt, the Supreme Court has held it is "intrinsically no different from testimonial evidence" because although "circumstantial evidence may in some cases point to a wholly incorrect result" this is "equally true of testimonial evidence." *Holland v. United States*, 348 U.S. 121, 140 (1954) (rejecting contention that circumstantial evidence must exclude every hypothesis but guilt). "In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference," and "[t]he jury must use its experience with people and events in weighing the probabilities." *Id.* "If the jury is convinced beyond a reasonable doubt, [the Supreme Court] require[s] no more." *Id. See also Jackson*, 443 U.S. at 324–26 (finding circumstantial evidence sufficient to prove specific intent).

Under AEDPA, "reviews of *Jackson* claims are subject to two levels of judicial deference creating a high bar: first, the state appellate court determines whether any rational trier of fact

could have found the evidence sufficient; second, a federal court may only overturn the appellate court's finding of sufficient evidence if it was objectively unreasonable." *Saxon v. Lashbrook*, 873 F.3d 982, 988 (7th Cir. 2017).

### 2.    State Court Determination

The Indiana Court of Appeals consolidated the appeals of Ojile and Erkins and stated as follows in denying their sufficiency of evidence claims:

> Appellants next contend that the evidence is insufficient to support their convictions for class A felony conspiracy to commit robbery resulting in serious bodily injury. Our standard of review is well settled:
>
> > In reviewing a claim of insufficient evidence, we will affirm the conviction unless, considering only the evidence and reasonable inferences favorable to the judgment, and neither reweighing the evidence nor judging the credibility of the witnesses, we conclude that no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.
>
> *Wieland v. State,* 736 N.E.2d 1198, 1201 (Ind. 2000).
>
> A person commits the crime of conspiracy when: (1) with intent to commit a felony; (2) the person agrees with another person to commit the felony; and (3) an overt act is performed by the defendant or the person with whom the defendant made the agreement in furtherance of that agreement. Ind. Code § 35–41–5–2. "In proving the agreement element, the State is not required to show an express formal agreement, and proof of the conspiracy may rest entirely on circumstantial evidence." *Wieland,* 736 N.E.2d at 1203.
>
> Robbery is defined in Indiana Code Section 35–42–5–1, which provides,
>
> > A person who knowingly or intentionally takes property from another person or from the presence of another person:
> >
> > > (1) by using or threatening the use of force on any person; or
> > >
> > > (2) by putting any person in fear;
>
> commits robbery, a Class C felony. However, the offense is a Class B felony if it is committed while armed with a deadly weapon or results in bodily injury to any person other than a defendant, and *a Class A felony if it results in serious bodily injury to any person other than a defendant.*

8

(Emphasis added.)

"Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes:

(1) serious permanent disfigurement;

(2) unconsciousness;

(3) extreme pain;

(4) permanent or protracted loss or impairment of the function of a bodily member or organ; or

(5) loss of a fetus.

Ind. Code § 35–31.5–2–292.

Appellants first contend that the robbery statute requires the actual existence of serious bodily injury because the robbery statute uses "results" and S.M. did not suffer any injury whatsoever. This is an issue of first impression.

. . . .

Indiana Code Section 35–42–5–1 makes the crime of robbery more serious when it is committed in such a way that serious bodily injury to a person other than the defendant is a result of the crime. To sustain a conviction for class A felony robbery, "[t]he state does not have to prove that the defendant knowingly or intentionally caused such injury. If serious bodily injury occurred as a consequence of the conduct of the accused, the offense is a class A felony." *Phares v. State,* 506 N.E.2d 65, 69 (Ind. Ct. App. 1987).

Here, however, Appellants did not actually commit robbery and were not charged with robbery. Appellants were charged with and convicted of *conspiracy.* By its very nature, conspiracy is a crime of intent and agreement. To sustain a conviction for conspiracy, the State is not required to prove that the crime intended and agreed upon was actually committed or even attempted. *Coleman v. State,* 952 N.E.2d 377, 382 (Ind. Ct. App. 2011). Appellants' argument that the robbery statute requires actual injury ignores the fact that Appellants' were charged with conspiracy to commit robbery resulting in serious bodily injury . . . Conspiracy is a felony of the same class as the underlying felony. Ind. Code § 35–41–5–2. Their argument implies that two people could never conspire to achieve a specific result. We are unpersuaded. Accordingly, we conclude that the evidence is sufficient to support a conviction for class A felony conspiracy to commit robbery where the State establishes beyond a reasonable doubt that the coconspirators intended and agreed to cause serious bodily injury to the victim in perpetrating the robbery.

Appellants also assert that even if the mere intent to inflict serious bodily injury while committing a robbery supports a conviction for class A conspiracy, there was insufficient evidence that they intended to inflict serious bodily injury on S.M. We disagree. The evidence shows that in the middle of the night Ojile surveilled S.M. for two and a half hours. Meanwhile, Erkins waited in Ojile's girlfriend's car. During the surveillance, Ojile told Erkins that they "should lay on [S.M.]" and that he was willing to "go all the way." State's Ex. 3, 7. Erkins did not disagree with these comments. Rather, Erkins agreed that it would be all right to continue to wait to see if S.M. was going to leave. After it became clear that S.M. was going to spend the night at the casino, Appellants went home. However, that was not the end of their plans to rob S.M. They had another conversation in which they talked about S.M. at length. Ojile and Erkins each stated that S.M. would not be a "smooth." State's Ex. 2, 7. Erkins stated that no one would be around in the daytime to help S.M. if "we kind of like roughed him up and s**t like that." *Id.* When Appellants were picked up the following day by Ohio police, they had dark clothing, camouflage gloves, duct tape, and a backpack containing a .40 caliber Glock handgun and a .40 cartridge. Based on the evidence favorable to the convictions and the reasonable inferences arising therefrom, we conclude that a reasonable factfinder could find beyond a reasonable doubt that Appellants intended and agreed to inflict serious bodily injury on S.M. when they robbed him . . . Appellants' argument is merely an invitation to reweigh the evidence, which we may not do.

*Erkins v. State*, 988 N.E.2d 299, 308–10 (Ind. Ct. App. 2013) (footnotes omitted).

Ojile and Erkins filed separate petitions to transfer to the Indiana Supreme Court each arguing there was insufficient evidence to convict them of robbery resulting in serious bodily injury. (Dkts. 10-9 at 2–10; 16-1 at 25–32). The Indiana Supreme Court granted Erkins's transfer petition, rejected Erkins's sufficiency-of-evidence claim, and denied Ojile's petition to transfer. *Erkins v. State*, 13 N.E.3d 400, 406–11 & n.5 (Ind. 2014). The Indiana Supreme Court affirmed the reasoning of the Indiana Court of Appeals regarding the requirements of the language "resulting in" contained in the robbery statute as applied to a charge of conspiracy and concluded "there is more than sufficient evidence that Erkins and Ojile conspired not only to rob S.M. but also to seriously injure S.M. in the course of robbing him." *Id.* at 408–11.

### 3.    Analysis of Ground 1

In Ojile's case, it is unclear whether the last-reasoned state court decision is that of the Indiana Court of Appeals or the Indiana Supreme Court; however, applying AEDPA review to either decision yields a denial of habeas relief.

The trial record demonstrates the jury was presented with physical and video surveillance, of Ojile watching S.M. inside the casino for several hours while Erkins waited inside a vehicle outside the casino. (Trial Tr. at 277–305, 325–30, 341–47, 362). The trial record includes audio recordings of wiretapped telephone conversations between Ojile and Erkins about robbing S.M. *Id.* at 269–75, 306–24. In the calls, Ojile and Erkins discussed, among other things, S.M.'s winning a large sum of money in the casino; S.M. having money on his person; their decision to wait until S.M. left the casino; that it was worth it to rob S.M.; that they would lay in wait to rob him; that they knew where he lived; that they would rough up S.M. because S.M. would likely "fight back"; that they would do whatever it takes, use whatever act of violence, to rob him; and, after S.M. decided to stay at the casino overnight, Ojile and Erkins's conversation agreeing they "would try tomorrow" because there were too many people around during the daytime. *Id.*; State's Exhibits 1–7.

During trial, evidence was presented that police arrested Ojile and Erkins the next day and found in their possession firearms, ammunition, gloves, duct tape, and dark clothing. (Trial Tr. at 347–62). The items found in their possession and the recorded conversations and surveillance, are sufficient to support rational inferences that Ojile and Erkins conspired with intent to rob S.M., conspired with intent to cause S.M. serious bodily injury in the course of that robbery, and conducted overt acts in furtherance of the objective of their conspiracy.

11

Ojile alleges the state court's decision is based on an unreasonable determination of the facts because it was based on evidence recovered after his arrest for a separate incident that the Court of Appeals mistook as evidence gathered during arrest for the underlying offense. (Dkt. 1 at 15). Ojile does not specify the evidence. *Id.* The trial court ruled the dark clothing, camouflage gloves, duct tape, and a backpack containing a .40 caliber Glock handgun and a .40 cartridge that police found in Erkins' vehicle when he and Ojile were arrested, were "intrinsic" to the alleged crime, and relevant to establish a basis for the jury to infer that Ojile and Erkins conspired with the intent to rob the victim resulting in serious bodily injury. (Trial Tr. at 302, 331–35, 349–61). Evidence was also presented that police conducted a search of Ojile's apartment where they found a loaded magazine for a .40 caliber handgun. *Id.* at 264, 357–58.

The state court's conclusion that there is sufficient evidence to support the conviction is not unreasonably based on unrelated evidence that was not presented at trial. Ground 1 is denied because the state appellate court's decision is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court and is not based on an unreasonable determination of the facts considering the evidence presented in the state court proceedings.

### B.    Ground 2—Juror Misconduct

Ojile alleges he was denied his Sixth Amendment right to an impartial jury because Juror McKinley "deliberately failed to answer honestly a material question on *voir dire* where a correct response would have provided a valid basis for a challenge for cause." (Dkt. 1 at 8, 15). He alleges Juror McKinley was asked whether he had family or friends in law enforcement and the juror failed to disclose he was the son of the uniformed Special Deputy who transported Ojile to and from the jail for trial and remained in the courtroom throughout trial. *Id.* The Respondent contends the state

12

court correctly identified the controlling federal law and reasonably applied that law in determining Ojile failed to demonstrate juror misconduct. (Dkt. 10 at 19–20).

Additional background information is necessary to resolve this claim in the petition.

### 1.    Additional Background

Juror McKinley filled out and signed a jury questionnaire. (Dkt. 11-3 at 3–4). The questionnaire directed, "If you, a close friend, a member of your family is or has been in law enforcement, state name and position held" and he responded, "Chris Powell – Friend." *Id.*

At *voir dire* of the first set of prospective jurors, including McKinley, no one responded when asked whether anyone had positive or negative experiences with law enforcement. (Trial Tr. at 66). Juror McKinley agreed he could return a not-guilty verdict if the State failed to meet its burden of proof. *Id.* at 99–100. He agreed he would not hold it against the defendants if they exercised their right not to testify at trial. *Id.* at 104. He stated he was able to keep his emotions "out of it," made decisions "logically," and would look at what is presented to him in rendering his decision. *Id.* at 106. McKinley was selected to serve on the jury after the first round of peremptory challenges. *Id.* at 111.

During *voir dire* of prospective jurors to fill the remaining seats, the parties asked individual prospective jurors about their relationships with those who were or had worked in law enforcement, but did not revisit the issue with Juror McKinley. *Id.* at 126–27, 142, 149–50, 158, 165–71, 176. Before presentation of evidence, the jurors were instructed "[i]f, at any time, you realize you know something about the case or know a witness or either Defendant, you must inform the bailiff privately at your earliest opportunity." (Dkt. 11-6 at 85, 87). In the final jury instructions, the jurors were informed: "You are the exclusive judges of the evidence, which may be either witness testimony or exhibits"; "Your verdict should be based on the law and the facts as you find

them. It should not be based on sympathy or bias"; and "Your verdict should be based only on the evidence admitted and the instructions on the law." *Id.* at 120–21, 127.

In his initial and amended petitions for state post-conviction relief, Ojile alleged his due process right to an impartial jury was violated, arguing Juror McKinley deliberately failed to disclose he was related to the deputy sheriff who transported Ojile to and from the jail for trial and was present in the courtroom throughout Ojile's trial. (Dkt.11-5 at 12, 19, 40, 48–54).

At a state post-conviction evidentiary hearing, Juror McKinley testified Irvin McKinley is his father. (Dkt. 11-1 at 7–9). Juror McKinley admitted his father "[h]ad been a special deputy earlier in times . . . in 1990 maybe" for a local sheriff, and he considered that to be a law enforcement officer position. *Id.* at 10, 27, 32. But, Juror McKinley stated he had "very little contact" with his father, had no idea what his father was doing at the time of the trial, didn't know his father was a law enforcement officer, and "didn't even think of him as to be put on the paper" in response to the questionnaire. *Id.* at 27–29, 32, 35. Juror McKinley explained, "I hadn't heard or talked to my dad, other than maybe funerals, and that's just standing in line to see him, in eighteen years up to today. I don't know how long it had been at that time," and Juror McKinley confirmed he "[d]idn't know that [his father] was an officer of any sort." *Id.* at 10.

When asked whether he saw his father in the courtroom before he was seated as a juror, Juror McKinley replied, "Not that I know of . . . I would've stated . . .." *Id.* at 22. Juror McKinley admitted that on the second of third day of trial, for the first time he recognized his father in the courtroom. *Id.* at 10–11, 16, 33–34. Juror McKinley saw his father was "a jailer, or a deputy sheriff, or a sheriff" during trial and considered his father to be acting in a law enforcement officer position. *Id.* at 9–10.

14

After Juror McKinley realized his father was in the courtroom, he did not divulge the information because he "wasn't asked." *Id.* at 10–11. Juror McKinley confirmed his verdict was based only on the evidence presented at trial, and he did not speak with his father about the case during trial. *Id.* at 34. Juror McKinley confirmed the fact that his father was a transport officer in the courtroom did not sway him to submit a guilty verdict. *Id.*

Irvin Clyde McKinley, hereinafter "Special Deputy McKinley," testified he was a volunteer "special" deputy for Ohio County, Indiana, who drove prisoners to and from the jail and court. *Id.* at 37–39. He transported Ojile from the jail to the courthouse for the trial, walked Ojile into the courtroom from the waiting room at the courthouse, walked Ojile to the waiting room for breaks, and was present in the courtroom "all during the trial." *Id.* at 41–43. He did not investigate any cases, including Ojile's case, and was never called as a witness in Ojile's case. *Id.* at 50–51. He did not consider himself a "law enforcement" officer at the time of the trial. *Id.* at 38.

Special Deputy McKinley said his son, Juror McKinley, knew he was a transporter when he first started working as one, but they had not spoken in five or six years before Ojile's trial. *Id.* at 39–41. Special Deputy McKinley spotted Juror McKinley, in the courtroom "during the jury selection." *Id.* at 43, 46. Special Deputy McKinley testified that, "when they were picking the jurors," he informed a lawyer "that's my son," but the lawyer did not seem to care, so he dropped the subject. *Id.* at 44. Special Deputy McKinley did not inform the court, bailiff, prosecutor, or defense attorneys. *Id.* at 45.

### 2.    Standards for Evaluating Juror Misconduct

The Sixth Amendment guarantees criminal defendants a fair trial, which assumes "a jury capable and willing to decide the case solely on the evidence before it." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)).

"It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Murphy v. Fla.*, 421 U.S. 794, 800 (1975) (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)). "At the same time, [a] 'juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Id.* "Due process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith*, 455 U.S. at 217. "In most cases, the redress for assertions of bias is a hearing in which the defendant is given a chance to prove actual bias." *United States v. Medina*, 430 F.3d 869, 875 (7th Cir. 2005).

In extreme situations, bias may be implied, e.g., where there is "a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Smith*, 455 U.S. at 222 (O'Connor, J., concurring). Courts have presumed bias in circumstances where a prospective juror was connected to the litigation in a way that it was highly unlikely the juror could act impartially. *See Burton v. Johnson*, 948 F.2d 1150, 1159 (10th Cir. 1991) (bias presumed in murder trial involving battered-wife-syndrome defense because juror lived in abusive situation at time of trial); *United States v. Eubanks*, 591 F.2d 513, 517 (9th Cir. 1979) (bias presumed in heroin conspiracy trial for juror whose sons were imprisoned for heroin crimes); *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977) (bias presumed for jurors who worked for a different branch of bank that defendant was charged with robbing); *Jackson v. United States*, 395 F.2d 615, 617–18 (D.C. Cir. 1968) (bias presumed because juror participated in love-triangle analogous to one at issue in trial); *U.S. ex rel. De Vita v. McCorkle*, 248 F.2d 1, 8 (3d Cir. 1957) (bias imputed in robbery case where juror was

victim of a robbery before trial). However, "[c]ourts have declined to find implied bias when a juror was personally acquainted with a witness provided no actual bias existed." *Tinsley v. Borg*, 895 F.2d 520, 528–29 (9th Cir. 1990). *See e.g. United States v. Bradshaw*, 787 F.2d 1385, 1390 (10th Cir. 1986) (jurors knew government witnesses).

When determining whether a new trial is warranted based on a juror's failure to supply correct information during *voir dire*, the Supreme Court has clearly established a two-prong test:

> [T]o obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*McDonough Power Equipment, Inc.*, 464 U.S. at 556.

IN ST JURY Rule 17(a)(6), states in relevant part that in both civil and criminal cases, "[p]arties shall make all challenges for cause before the jury is sworn to try the case," and the court shall sustain a challenge for cause if the prospective juror, "is related within the fifth degree to the parties, their attorneys, or any witness subpoenaed in the case." IN ST JURY R. 17(b)(4) states in relevant part that in a criminal case, the court shall sustain a challenge for cause if the prospective juror had formed or expressed an opinion about the outcome of the case which appears to be founded upon a "conversation with a witness to the transaction."

Ind. Code § 35-37-1-5 states good cause to challenge a prospective juror in a criminal trial includes, in relevant part, where a juror (1) has formed or expressed an opinion as to the guilt or innocence of the defendant; (2) is related within the fifth degree to the person alleged to be the victim of the offense charged, to the person on whose complaint the prosecution was instituted, or to the defendant; (3) is biased or prejudiced for or against the defendant; or (4) has a personal interest in the result of the trial.

### 3.    State Court Determination

During initial state post-conviction review, the Indiana Court of Appeals applied the *McDonough* test and determined, even if Ojile could establish Juror McKinley failed to answer honestly a material question, Ojile cannot establish a correct response provided a valid basis for a challenge for cause because the record does not support a finding the juror was actually or impliedly biased:

> Ojile first argues that the post-conviction court erred by not granting him a new trial based on juror misconduct. Specifically, Ojile argues Juror McKinley failed to disclose that his father was the deputy that transported Ojile to and from trial and this violated Ojile's Sixth Amendment right to an impartial jury.
>
> The Sixth Amendment to the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State . . . ." This is made binding on the states by the Fourteenth Amendment. *Wilkes v. State*, 984 N.E.2d 1236, 1250 (Ind. 2013). To prevail on a claim of juror misconduct under the federal standard, Ojile must first demonstrate that a juror failed to answer honestly a material question and then further show that a correct response would have provided a valid basis for a challenge for cause. *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984) . . . The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial. *Id.*
>
> Even assuming the circumstances here satisfy the first prong of the *McDonough* test, Ojile must also show that this information would have provided a valid basis for a challenge for cause . . . Indiana Code section 35-37-1-5 governs challenges for cause and provides that:
>
> > (a)    The following are good causes for challenge to any person called as a juror in any criminal trial:
> >
> > . . . .
> >
> > > (11) That the person is biased or prejudiced for or against the defendant.
>
> "A juror's bias may be actual or implied." *Alvies v. State*, 795 N.E.2d 493, 499 (Ind. Ct. App. 2003), *trans. denied*. The post-conviction court determined there was no actual or implied bias here. We agree.
>
> Ojile contends actual bias should be inferred "since [Juror McKinley] intentionally failed to disclose that he was the son of [Special Deputy McKinley]."

But the post-conviction court found Juror McKinley did not intentionally fail to disclose this information, and the record supports this finding. Juror McKinley testified at the 2022 post-conviction hearing that he had barely seen or spoken to his father in eighteen years, meaning at the time of the 2012 trial he had not spoken to his father in eight years, and did not know that he was in law enforcement. Thus, it does not appear that he intentionally failed to disclose this information on the questionnaire or during *voir dire*. Further, he testified that he did not see his father in the courtroom until the second day of trial. As the State points out, the jury was only instructed to alert the court upon realization that they knew "a witness or either Defendant," neither of which describes Special Deputy McKinley. Thus, we do not agree with Ojile that Juror McKinley's failure to disclose the relationship shows actual bias.

Nor do we see any implied bias. Juror bias may be implied "where a relationship exists between the juror and one of the parties." *Caruthers v. State*, 926 N.E.2d 1016, 1020 (Ind. 2010). Here, Juror McKinley was the son of Special Deputy McKinley, who transported Ojile to and from trial and remained in the courtroom with him. Special Deputy McKinley was not a witness, nor was he involved in the investigation. *Cf. Woolston v. State*, 453 N.E.2d 965, 968 (Ind. 1983) (implied bias existed where juror knew three of the testifying witnesses and his wife worked for the police department on defendant's case). In fact, it does not appear he even volunteered for the same law-enforcement agency involved in Ojile's investigation and arrest . . . *See Porter v. State*, 391 N.E.2d 801, 816 (Ind. 1979) (trial court did not err in refusing to remove for cause juror who was a volunteer sheriff's deputy at an uninvolved law-enforcement agency). Furthermore, Special Deputy McKinley and Juror McKinley were estranged, and Juror McKinley testified his father's involvement in the trial had no bearing on the guilty verdict. Given the tenuous relationship between Special Deputy McKinley and the prosecution, and between Special Deputy McKinley and Juror McKinley, we cannot say the post-conviction court erred in finding no implied bias here.

The post-conviction court did not err in determining that a new trial is not warranted based on Ojile's juror-misconduct claim.

*Ojile*, 207 N.E.3d 1221 (footnotes and internal record citations omitted). The Indiana Supreme Court denied Ojile's petition to transfer. *Ojile*, 209 N.E.3d 1183.

### 4.    Analysis of Ground 2

The Indiana Court of Appeals's application of clearly established federal law as determined by the Supreme Court is objectively reasonable and its determination is not based on an unreasonable determination of fact considering the evidence presented in the state court proceedings. The record supports the conclusion that Juror McKinley did not fail to answer

honestly a material question and was not actually biased. Juror McKinley and Special Deputy McKinley each testified they were estranged for many years before Ojile's trial. And although his father had acted in a law enforcement capacity in the past, Juror McKinley had no idea when he filled out his questionnaire that his father was active in law enforcement; otherwise, he testified he would have disclosed that fact. And although Special Deputy McKinley noticed Juror McKinley during *voir dire*, Juror McKinley did not recognize his father in the courtroom until the second or third day of trial, after the jury, including McKinley, was selected. Thereafter, Juror McKinley was instructed to inform the bailiff only if he realized he knew something about the case or knew a witness or the Defendant, which, as the Indiana Court of Appeals reasonably determined, did not present an obligation for Juror McKinley to disclose the relationship. Finally, Juror McKinley confirmed his estranged relationship with Special Deputy McKinley did not affect his determination of the verdict.

The state court record also supports the determination that, even assuming Juror McKinley had disclosed his father was the special deputy who transported and accompanied Ojile for trial, correct responses to questions about Special Deputy McKinley would not have provided a valid basis for a challenge for cause—or imply bias on the part of Juror McKinley. Juror McKinley was not "related within the fifth degree to the parties, their attorneys, or any witnesses subpoenaed in the case." *See* Ind. Jury R. 17(a)(6). Nothing suggests that, due to his relationship with Special Deputy McKinley, Juror McKinley formed or expressed an opinion as to guilt or innocence, was in fact or implicitly biased for or against Ojile or had a personal interest in the outcome of the trial. *See* Ind. Code §§ 35-37-1-5(a)(2), (a)(4), (a)(11), (a)(14). To the contrary, Juror McKinley and Special Deputy McKinley confirmed their relationship was estranged and Juror McKinley confirmed his relationship to Special Deputy McKinley did not at all influence his verdict.

Ground 2 is denied because the state appellate court was objectively reasonable in its determination Ojile did not establish Juror McKinley failed to honestly respond to questions in the questionnaire and during *voir dire*, that Juror McKinley was actually biased against him, that Juror McKinley's relationship with Special Deputy McKinley constitutes an extreme circumstance that warrants implying bias, or the circumstances warrant excusal for cause.

### C.    Grounds 3, 4, and 5

Respondent contends Grounds 3, 4, and 5, must be dismissed as procedurally defaulted or as meritless. (Dkt. 10 at 12, 20–26).

### 1.    Standards for Evaluating Procedural Default

"There are two distinct ways in which a state prisoner can procedurally default a federal claim." *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016). "The first . . . comes from the independent and adequate state ground doctrine." *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991)). "The second comes from the rule that before pursuing post-conviction relief in federal court, a state prisoner must 'exhaust[ ] the remedies available in the courts of the State,' 28 U.S.C. § 2254(b)(1)(A), by giving the state courts an 'opportunity to act on his claims,' *O'Sullivan v. Boerckel*, 526 U.S. 838, 842–44 (1999)." *Id.*

### a.    Fair Presentation and Exhaustion

"[E]xhaustion of state remedies requires that petitioners fairly present federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (internal quotation marks and citations omitted) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). Each claim must have been "fairly presented," in the manner prescribed by state law. *See O'Sullivan*, 526 U.S. at 848.

"[F]air presentation contemplates that both the operative facts and the controlling legal principles must be submitted to the state court." *Williams v. Washington*, 59 F.3d 673, 677 (7th Cir. 1995) (citing *Picard*, 404 U.S. at 277). Moreover, a petitioner must fairly present the claim throughout at least one complete round of state-court review, whether on direct appeal of his conviction or in post-conviction proceedings. *O'Sullivan*, 526 U.S. at 847–48 (holding a prisoner who fails to present his claims in a petition for discretionary review to a state court of last resort has not properly presented his claims to the state courts). Failure to fairly present a claim to the state courts results in a procedural default that generally precludes federal review. *See Hough v. Anderson*, 272 F.3d 878, 892 (7th Cir. 2001). When a habeas petitioner fails to fairly present his claim to the state courts and the opportunity to raise the claim has passed, the claim is procedurally defaulted. *O'Sullivan*, 526 U.S. at 853–54.

"[W]here [a] claim has been presented for the first and only time in a procedural context in which its merits will not be considered unless there are special and important reasons therefor . . . [it will not] constitute fair presentation." *Castille v. Peoples*, 489 U.S. 346, 351 (1989) (holding that raising issue for first time in a petition to the state's highest court for review was not "fair presentation" of the claim where review under state law was "not a matter of right, but of sound judicial discretion, and an appeal will be allowed only when there are special and important reasons therefor") (internal citation omitted).

### b.    Independent and Adequate State Procedural Rule

"A federal court will not review a question of federal law decided by a state court if the decision of the state court rests on a state procedural ground that is independent of the federal question and adequate to support the judgment." *Moore v. Bryant*, 295 F.3d 771, 774 (7th Cir. 2002) (citing *Stewart v. Smith*, 536 U.S. 856 (2002); *Coleman*, 501 U.S. at 729). "The independent

and adequate state ground doctrine 'applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement.'" *Id.* (citing *Coleman*, 501 U.S. at 729–30). A state rule is sufficient to bar federal habeas review when "the state rule in question was firmly established and regularly followed." *Beard v. Kindler*, 558 U.S. 53, 60 (2009) (holding "[a] discretionary state procedural rule can serve as an adequate ground to bar federal habeas review.").

The independent and adequate state law doctrine "[w]ill not bar habeas review unless the state court actually relied on the procedural default as an independent basis for its decision." *Moore*, 295 F.3d at 774 (citing *Harris v. Reed*, 489 U.S. 255, 261–62 (1989); *Braun v. Powell*, 227 F.3d 908, 912 (7th Cir. 2000)). If the decision of the last state court to which the petitioner presented his federal claims fairly appears to rest primarily on the resolution of those claims and does not clearly and expressly rely on the procedural default, a federal habeas court may conclude there is no independent and adequate state ground and proceed to hear the federal claims. *See id.* (citing *Harris*, 489 U.S. at 263–65; *Coleman*, 501 U.S. at 735).

### c.    Cause and Prejudice to Overcome Procedural Default

When a prisoner "procedurally defaults" a federal claim, judicial review is barred unless he can show either: (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law," or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. "Cause for a procedural default exists where 'something external* to the petitioner, something that cannot fairly be attributed to him . . . impeded [his] efforts to comply with the State's procedural rule.'" *Maples v. Thomas*, 565 U.S. 266, 280–81 (2012) (internal quotation marks omitted) (quoting *Coleman*, 501 U.S. at 753 and *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (emphasis in original)). "Then, to establish prejudice, the prisoner must show

not merely a substantial federal claim, such that 'the errors at . . . trial created a possibility of prejudice,' but rather that the constitutional violation 'worked to his *actual* and substantial disadvantage.'" *Shinn v. Ramirez*, 596 U.S. 366, 379–80 (2022) (quoting *Murray*, 477 U.S. at 494 and *United States v. Frady*, 456 U.S. 152, 170 (1982)) (internal quotation marks omitted) (emphasis in original)). To establish a miscarriage of justice will occur if habeas relief is foreclosed, a petitioner must show "he is actually innocent of the offense for which he was convicted," i.e., "no reasonable juror would have found him guilty of the crime but for the error(s) he attributes to the state court." *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004) (citing *Schlup v. Delo*, 513 U.S. 298, 327–29 (1995)).

### 2.    Ground 3—Fair Notice of Charge and Evidence

Ojile alleges his due process right to fair notice of the crime alleged against him was denied because (A) a deadly weapon was not mentioned in the charging information yet the State introduced evidence he possessed a deadly weapon when he was arrested and used it to argue his possession of the firearm supported his conviction; and (B) the language of the information varied from the statutory language for robbery under Ind. Code § 35-42-5-1 because it alleged conspiracy to commit robbery *causing* serious bodily injury, rather than as the statute states, conspiracy to commit robbery *resulting in* serious bodily injury. (Dkt. 1 at 9, 15–16). The Respondent contends Ground 3(A) was not fairly presented to the state courts, Ground 3(B) was rejected on adequate and independent state law grounds, and both grounds lack merit. (Dkt. 10 at 12–15).

### a.    Additional Background

At Ojile's initial appearance in state court, the charge and the robbery statute were each read to him, including the variance in the language of the information and the robbery statute, and Ojile did not question that variance:

COURT: All right. First thing let's do is, let's go over the charges. It appears to me you've each received a copy?

A: uh-hm.

COURT: And these charges read as follows: Count 1: it says, I, Anthony Scott, do affirm under penalties for perjury that on or about October the 6th, 2010, in Ohio County, State of Indiana, that Ugbe Ojile and Kennyatta Erkins, with intent to commit the felony of robbery *causing* serious bodily injury did agree with one another to commit the felony of robbery *causin*g serious bodily injury, and Kenyatta Erkins did perform an overt act in furtherance of said agreement, to-wit: conduct surveillance of [S.M.] at the Grand Victoria Casino. All of which is contrary to the form of the statute in such cases made and provided, to-wit: Ind. Code § 35-41-5-2, 35-42-5-1, and against the peace and dignity of the State of Indiana.

. . . .

THE COURT: [State Prosecutor], would you review the applicable statutes under which these charges are brought?

[THE STATE]: As to both Mr. Erkins and Mr. Ojile, they're charged under count one with conspiracy to commit robbery, *causing* serious bodily injury, under Indiana Code 35-42-5-2, and Indiana Code 35-42-5-1 . . . Indiana Code 35-42-5-1, the robbery statute reads, as follows: A person who knowingly or intentionally takes property from another person or from the presence of another person by using or threatening the use of force on any person or by putting any person in fear commits robbery, a Class C felony. However, the offense is a Class B felony if it is committed while armed with a deadly weapon or results in bodily injury to any person other than a defendant, and a Class A felony if it *results in* serious bodily injury to any person other than a defendant.

. . . .

Trial Tr. at 6–10.

Before opening statements at trial, the trial court granted the State's motion to amend the information to state Ojile, not Erkins, committed an overt act of personally conducting surveillance on the victim. (Trial Tr. at 186–87). In doing so, the trial court held the amendment caused "no undue surprise or prejudice." *Id.* at 193. The amended information used the term *causing* rather than *results in*:

On or about October 6, 2010, in Ohio County, State of Indiana, Ugbe Ojile and Kennyatta Erkins, with the intent to commit the felony of Robbery *Causing*

Serious Bodily Injury, did agree with one another to commit the felony of Robbery *Causing* Serious Bodily Injury and Ugbe Ojile did perform an overt act in furtherance of said agreement, to wit: conducted surveillance on [S.M.] at the Grand Victoria Casino

All of which is contrary to the form of the statute in such cases made and provided, to wit: I.C. 35-41-5-2 and I.C. 35-42-5-1, and against the peace and dignity of the State of Indiana.

(Dkt. 11-6 at 62 (emphasis added).

Preliminary jury instructions stated Ojile was charged with "conspiracy to commit robbery *causing* serious bodily injury," and referenced Ind. Code §§ 35-41-5-2 and 35-42-5-1. (Dkt. 11-6 at 65, 70–73 (emphasis added). However, the final jury instructions stated Ojile was charged with conspiracy to commit robbery *resulting in* serious bodily injury. (Dkt. 11-6 at 98–107 (emphasis added). Moreover, the instructions stated the State had to prove beyond a reasonable doubt that Ojile agreed with Erkins "to commit the crime of Robbery *Resulting in* Serious Bodily Injury . . .." *Id.* (emphasis added). Finally, the final jury instructions stated, "[i]f there is a conflict between the Preliminary Instructions and the Final Instructions, you should follow the Final instructions." *Id.* at 119.

### b.    Analysis of Ground 3(A)—Notice of Weapon as Evidence

Ojile raised this claim, that the charging information did not provide notice that the State would use evidence he possessed a firearm to establish his guilt for the charge, in a motion for leave to file a successive state post-conviction petition. (Dkts. 16 at 3; 16-1 at 8–10, 14–19). The Indiana Court of Appeals concluded Ojile failed to establish a reasonable possibility he is entitled to post-conviction relief. (Dkt. 16-1 at 4. The Respondent contends Ojile did not fairly present this claim to the state courts and the claim is alternatively meritless. (Dkt. 10 at 13–14, 21–22).

Indiana petitioners may request a second or successive petition for post-conviction relief. IN ST POSTCONV Rule PC 1. "The court will authorize the filing of the petition if the petitioner

establishes a reasonable possibility that the petitioner is entitled to post-conviction relief." *Id.* "In making this determination, the court may consider applicable law, the petition, and materials from the petitioner's prior appellate and post-conviction proceedings including the record, briefs and court decisions, and any other material the court deems relevant." *Id.* No transfer to the Indiana Supreme Court may be sought where the Indiana Court of Appeals declines to authorize the filing of a successive petition for post-conviction relief. Ind. R. App. P. 57(B).

The Indiana Court of Appeals did not clearly and expressly invoke a state procedural bar in denying Ojile's motion to file a successive petition. Instead, it appears the Indiana Court of Appeals reviewed the merits of the claims in the petition because it concluded Ojile did not establish a reasonable possibility he would be entitled to post-conviction relief. In this instance, the state appellate court's determination that Ojile didn't satisfy the standard for pursuing a successive post-conviction petition under state law does not constitute a state procedural ground that precludes federal habeas review. *See Moore*, 295 F.3d at 774 (citing *Harris*, 489 U.S. at 263–65; *Coleman*, 501 U.S. at 735).

Because the Indiana Court of Appeals's decision lacks explanation, in applying deferential review to that court's determination that there is no reasonable possibility Ojile is entitled to post-conviction relief, this Court would determine "what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e Supreme] Court." *See Harrington*, 562 U.S. at 100, 102.

Alternatively, this Court may reject the claim if it fails under *de novo* review. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can, however, deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies,

because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review, *see* § 2254(a)."); *Carrion v. Butler*, 835 F.3d 764, 772 (7th Cir. 2016) (bypassing statute of limitations and procedural default defenses "because even [if] we were to decide each of them in [the petitioner's] favor, his claims clearly fail on the merits.").

"No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal." *Cole v. State of Ark.*, 333 U.S. 196, 201 (1948). *See also Gray v. Netherland*, 518 U.S. 152 (1996) (acknowledging "A defendant's right to notice of the charges against which he must defend is well established" and remanding on claim that the State violated due process by misleading defendant about evidence it intended to use at sentencing when the officer deliberately lied to the defense about whether he would testify to maintain his undercover capacity).

Ojile's claim clearly fails on the merits under *de novo* review. The state-court record shows Ojile had reasonable notice, and was not misled, about the State's use of the weapon evidence against him. Ojile was arrested with the weapon in his possession on the day he and Erkins stated they would "try again" to rob the victim. At his initial appearance in state court, and again in the preliminary and final jury instructions, Ojile was made aware the information alleged he was charged with conspiracy to knowingly or intentionally take property from another "by using or threatening the use of force on any person or by putting any person in fear." Thus, Ojile was on reasonable notice the State could use his possession of a weapon to establish his intent to use or threaten force or fear. *See Jackson*, 443 U.S. at 324–26 (finding circumstantial evidence sufficient to prove specific intent); *Phipps v. State*, 90 N.E.3d 1190, 1195 (Ind. 2018) ("it is well-established that a defendant's intent can be proved by circumstantial evidence.").

For the foregoing reasons, Ground 3(A) is denied.

### c.    Analysis of Ground 3(B)—Notice of Statutory Language

In his initial state post-conviction review petition, Ojile raised a freestanding claim that his due process right to fair notice was violated because the charging information varied from the statutory language for the offense, along with a claim that trial counsel was ineffective for failing to correct the variance between the language used in the charging information and the statute. (Dkt. 11-5 at 12, 18–20). The Respondent contends Ground 3(B) is procedurally defaulted because it was rejected on adequate and independent state law grounds. (Dkt. 10 at 12–15).

On appeal from the denial of the petition, the Indiana Court of Appeals determined, in relevant part, and in the course of its determination of Ojile's ineffective assistance of counsel claim, that Ojile was barred from raising a freestanding claim that he was not given notice of the variance because the claim was known and available to him on direct review, and the claim "furthermore" lacks merit:

> [O]jile contends trial counsel was ineffective in failing to correct the charging information to reflect the language of the statutory crime. Ojile is correct that while the charging information indicates he conspired to commit Class A felony robbery causing serious bodily injury, *see* Appellant's App. Vol. III p. 62 (charging information), the actual crime enumerated in the relevant statute is Class A felony conspiracy to commit robbery that results in serious bodily injury. I.C. §§ 35-42-5-1 (2010) (robbery statute); 35-41-5-2 (2010) (conspiracy statute). But this is not necessarily an error.

> Indiana Code section 35-34-1-2(a)(4) requires that the information be in writing "setting forth the nature and elements of the offense charged in plain and concise language without unnecessary repetition . . . ." The information should state the offense in the language of the statute or in words that convey a similar meaning. *Smith v. State*, 465 N.E.2d 702, 704 (Ind. 1984). Minor variances from the language of the statute do not make an information defective, so long as the defendant is not misled or an essential element of the crime is not omitted. *Id.*

> We see no error in the charging information here. "Causing" and "results in" convey similar meanings, although "causing" necessitates that an act produce the conclusion, while "results in" requires only a certain conclusion occur, regardless of why it occurred. *See* Black's Law Dictionary (11th ed. 2019) (defining

"cause" as "[s]omething that produces an effect or result" and defining result as "[t]o be a physical, logical, or legal consequence; to proceed as an outcome or conclusion"). This distinction can matter in certain contexts. *See McElroy v. State*, 864 N.E.2d 392, 398 (Ind. Ct. App. 2007) (distinguishing between a statute that punished a defendant for "causing" death and a statute that punished leaving the scene of an accident "resulting" in death, reasoning that the first punished the defendant for causing the death and the second punished him for leaving the scene where a death resulted, regardless of who caused the death), *trans. denied*.

But we do not believe this variance to be material here, as Ojile has not shown us how this misled him. Ojile argues that, had he been charged with conspiracy to commit robbery that results in serious bodily injury, trial counsel could have argued "it was not defendant's specific intent for the robbery to result in serious bodily injury." . . . We see no reason why this argument was unavailable to Ojile just because the information stated he intended to "cause" serious bodily injury. In fact, Erkins's counsel made this exact argument at trial. . . . (defense arguing in closing that "Mr. Ojile and Mr. Erkins never agreed to cause serious bodily injury during the phone calls"). So the minor variance in language did not preclude him from making this argument at trial, and he has failed to show this misled him. *See Higgins v. State*, 690 N.E.2d 311, 314 (Ind. Ct. App. 1997) (finding no error in charging information where the defendant did not contend that his defense was affected by the wording of the information).

Ojile has not shown his trial counsel rendered ineffective assistance, and thus the post-conviction court did not err in denying his claims.

. . . .

[FN 6] [O]jile also asserts [a] freestanding claim[]-that his due-process rights were violated by . . . using "causing" instead of "results in" serious bodily injury in the charging information. As the State points out, these claims were available to Ojile on direct appeal, and thus he is barred from asserting them now. *Reed v. State*, 866 N.E.2d 767, 768 (Ind. 2007) ("Only issues not known at the time of the original trial or issues not available on direct appeal may be properly raised through post-conviction proceedings." (citation omitted)). Furthermore, as noted above . . . the minor variance in the charging information was not error. Thus, his due-process rights were not violated.

*Ojile*, 207 N.E.3d 1221.

The state court record demonstrates Ojile's claim in Ground 3(B) was clearly and expressly resolved on an independent and adequate state law ground as the Indiana Court of Appeals expressly and reasonably concluded the claim was available for Ojile's direct appeal, but he failed

to raise it. The Indiana Supreme Court has long held that issues known and available on direct appeal, but not raised, are waived for purposes of post-conviction relief. *See Reed v. State*, 856 N.E.2d 1189, 1194 (Ind. 2006) ("If an issue was known and available but not raised on appeal, it is waived.") (citing *Rouster v. State*, 705 N.E.2d 999, 1003 (Ind. 1999)). Even though the state appellate court reached the merits of the claim in an alternative holding, the independent and adequate state ground doctrine curtails reconsideration of the federal issue on federal habeas. *See Moore*, 295 F.3d at 775 (7th Cir. 2002) (quoting *Harris*, 489 U.S. at 264 n.10). Thus, Ground 3(B) is procedurally defaulted.

Ojile has not established any basis to overcome the procedural default, but even if he could do so, this Court would conclude the Indiana Court of Appeals's determination that the claim lacks merit is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court. Further it is not based on an unreasonable determination of fact considering the state court evidentiary proceedings. The Indiana Court of Appeals was objectively reasonable in its determination that Ojile was, despite the variance between the statutory language and the language set forth in the Information, informed about the essential elements of the offense as stated in the statute, and not prevented from arguing he did not conspire to commit robbery resulting in harm to the victim. *See Gray*, 518 U.S. 152. The state court record shows Ojile was on reasonable notice of the variance at his initial appearance, and again at trial where the jury was instructed it must determine guilt based on the statutory language, contained in the final jury instructions. As the jury presumably follows its instructions, *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), and Ojile was given ample notice of the charge and the variance in the language, the state appellate court was objectively reasonable in finding no basis to conclude Ojile was denied notice in violation of due process.

Ground 3(B) is dismissed because Ojile procedurally defaulted the claim and has not established cause and prejudice or that a miscarriage of justice will result if this Court fails to consider the claim. Alternatively, applying deferential review, the state appellate court's rejection of the claim is objectively reasonable, and the claim is denied.

### 3.        Ground 4—Ineffective Assistance of Trial Counsel

In Ground 4, Ojile alleges he received ineffective assistance of trial counsel in violation of the Sixth Amendment because counsel (A) failed to cross-examine Tina Ziegler about her interpretation of Ojile's conversation about the victim; and (B) failed to recognize and correct the language in the charging information. (Dkt. 1 at 11, 16). In his reply brief, Ojile adds counsel failed to utilize defenses available had Ojile been tried based on the statutory language. (Dkt. 16 at 2).

### a.        Ground 4(A)—Failure to Cross-Examine Witness

The Respondent argues Ojile did not fairly present this claim to the highest state court. (Dkt. 10 at 13). Ojile raised the claim in an initial state post-conviction petition and amended petition. (Dkt. 11-5 at 17, 40, 46–48). The Court of Appeals rejected the claim. (Dkt. 10-15 at 13–14).

Ojile did not identify the claim in Ground 4(A) in his petition for transfer to the Indiana Supreme Court. (Dkt. 10-16 at 2). Ojile, however, cross-referenced issues raised in his prior briefs: "Defendant also seeks review of any other issue previously raised, and other issues not raised but that affect 'Fundamental Rights' which allows this Court to address *sua sponte*. [Please see prior briefs for further arguments on these issues and all other issues]." *Id.* at 16.

In its decision denying transfer, the Indiana Supreme Court confirmed that it reviewed the decision of the Court of Appeals:

> This matter has come before the Indiana Supreme Court on a petition to transfer jurisdiction, filed pursuant to Indiana Appellate Rules 56(B) and 57,

following the issuance of a decision by the Court of Appeals. The Court has reviewed the decision of the Court of Appeals, and the submitted record on appeal, all briefs filed in the Court of Appeals, and all materials filed in connection with the request to transfer jurisdiction have been made available to the Court for review. Each participating member has had the opportunity to voice that Justice's views on the case in conference with the other Justices, and each participating member of the Court has voted on the petition.

Being duly advised, the Court DENIES the petition to transfer.

(Dkt.16-1 at 3.

The Court concludes that Ojile failed to exhaust his state court remedies. Under the Indiana rules, the Petition to Transfer shall concisely set forth "[a] brief statement identifying the issue, question, or precedent warranting Transfer." Ind. R. App. P. 57(G)(1). A party does not satisfy the requirement that petitions to transfer jurisdiction from the Court of Appeals to the Supreme Court include an argument section by merely cross-referencing an argument in its Court of Appeals merits briefing without elaborating on why that prior argument warrants the Supreme Court exercising its discretion to review the appeal. *Red Lobster Restaurants LLC v. Fricke*, 234 N.E.3d 159, 166 (Ind. 2024). Because Ojile did not identify the claim raised in Ground 4(A) in his petition for transfer and did not elaborate why his prior argument regarding his claim warranted transfer, Ojile's claim in Ground 4(A) was not fairly presented to the Indiana Supreme Court. The claim is therefore unexhausted and procedurally defaulted. Because Ojile has not demonstrated any basis to overcome the procedural default, Ground 4(A) is dismissed with prejudice.

### b.    Ground 4(B)—Failure to Object to Language in Charge

The Respondent contends Ojile did not fairly present this claim to the highest state court. (Dkt. 10 at 13). Ojile raised this claim in his initial state post-conviction review petition and amended petition. (Dkt. 11-5 at 12, 18, 40, 45). The petition was denied and the Court of Appeals determined counsel's performance was neither deficient nor prejudicial. (Dkt. 10-15 at 17–19). In

his petition to transfer the cause to the Indiana Supreme Court, Ojile challenged the Court of Appeals's ruling on the related substantive claim:

> Defendant was charged and tried on a "Conspiracy to Commit Robbery Causing Serious Bodily Injury" as a Class A Felony even though that charge does not exist under Indiana's Statutory Scheme. Did the Court of Appeals err in holding that this variance was not material because in its view "Causing" and "Resulting" convey similar meanings?

(Dkt. 10-16 at 2). And in the body of his petition for transfer, he argued counsel could have argued differently had counsel noticed the variance:

> [C]ounsel not realizing that he was defending against the wrong language in the statute, lost defenses that were otherwise available to him. If counsel had simply realized this during trial, he could have argued to the jury that there was not enough evidence to find defendant guilty of the charge because the State did not suggest, let alone prove that it was defendant's specific intent for the robbery to result in serious bodily injury.

*Id.* at 13.

Ojile's claim in Ground 4(B) was not fairly presented, and is unexhausted and procedurally defaulted because he failed to identify his claim of ineffective assistance of trial counsel in the petition for transfer, mentioning counsel might have made different arguments at trial if the variance was erroneous falls short of alleging an ineffective assistance of counsel claim, and cross-referencing his prior claim, without elaborating on the ineffective assistance of counsel claim, was insufficient to satisfy the requirements of state law. Ground 4(B) is dismissed with prejudice as procedurally defaulted.

### 4.    Ground 5—Ineffective Assistance of Appellate Counsel

In Ground 5, Ojile alleges he was denied effective assistance of appellate counsel in violation of the Sixth Amendment because counsel failed to challenge Ojile's conviction as a violation of due process and right to fair notice as argued in Grounds 3(A) and 3(B). (Dkt. 1 at 13, 16). The Respondent contends these claims are procedurally defaulted because Ojile never

presented these claims to the Indiana Supreme Court in a petition for transfer. (Dkt. 10 at 12). According to the state court record, Ojile identified no claims of ineffective assistance of appellate counsel in his petition for transfer of his initial state post-conviction proceeding. (Dkt. 10-16 at 2). And, as discussed, his cross-referencing other issues raised in prior briefs without elaboration does not constitute fair presentation sufficient to exhaust the claim. Accordingly, Ground 5 is dismissed with prejudice as procedurally defaulted.

## IV.    Certificate of Appealability

"A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal." *Buck v. Davis*, 580 U.S. 100 (2017). Instead, a state prisoner must first obtain a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). In deciding whether a certificate of appealability should issue, "the only question is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck*, 580 U.S. 100 (citation and quotation marks omitted). Where a petitioner's claim is resolved on procedural grounds, a certificate of appealability should issue only if reasonable jurists could disagree about the merits of the underlying constitutional claim and about whether the procedural ruling was correct. *Flores-Ramirez v. Foster*, 811 F.3d 861, 865 (7th Cir. 2016) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Applying these standards, the Court finds a certificate of appealability is not warranted.

## V.    **CONCLUSION**

For the reasons explained in this Order, Ugbe Ojile's Petition for Writ of Habeas Corpus, Dkt. [1] is **DENIED**. A certificate of appealability is **DENIED**. The Motions for Case Status, Dkts. [18] and [19], are **GRANTED** in so far as this Order provides the status of this case.

Final judgment consistent with this Order shall now issue.

**IT IS SO ORDERED**.

Date: 1/29/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

UGBE OJILE
A614-212
Correctional Reception Center
PO Box 300
Orient, OH 43146

Caroline Templeton
INDIANA ATTORNEY GENERAL
caroline.templeton@atg.in.gov